Filed 1/31/14  In re K.R. CA1/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re K.R., a Person Coming Under the Juvenile Court Law. | |
| SAN MATEO COUNTY HUMAN SERVICES AGENCY,<br><br>      Plaintiff and Appellant,<br><br>v.<br><br>S.R.,<br><br>      Defendant;<br><br>D.H. et al.,<br>      Appellants. | A138121<br><br>(San Mateo County<br>Super. Ct. No. JV81521) |

### INTRODUCTION

The minor K.R., the San Mateo County Human Services Agency (Agency), and the presumed father D.H., all appeal from the juvenile court's order of March 7, 2013, denying the minor's Welfare and Institutions Code section 388[1] motion to vacate a prior order finding D.H. to be the presumed father, placing the minor in D.H.'s custody, and determining the Agency provided D.H. with reasonable reunification services.  We affirm the order in all respects.

---

[1] All further statutory references to the Welfare and Institutions Code unless otherwise indicated.

1

We set forth only those facts necessary for a determination of the issues on appeal.**²**

In June 2011, the Agency filed a section 300 petition regarding K.R. and her half siblings, who were then living with their mother. The petition alleged failure to protect based on the mother's substance abuse and involvement in domestic violence. K.R., then three years old, was detained and placed in a foster home.

The following month, the Agency filed an amended petition identifying K.R.'s alleged father and alleging his whereabouts were unknown. Following a contested hearing, the juvenile court sustained the amended petition. On August 15, the court declared the minor a dependent child, found "continuance at home would be contrary to [her] welfare," and committed her to the care, custody and control of the Agency.

In the meantime, on August 1, D.H. contacted the social worker and requested placement of the minor and her half brothers. D.H. stated he and the mother "began dating when [K.R.] was born and had known each other for a few months prior. [D.H.] stated they met in Merced County when he drove a bus for a program that brought people to church on Friday evenings." The Agency indicated it was "assessing the situation, but there are concerns about [D.H.'s] mental health and substance abuse history as well as the situation with his own children."

On October 18, D.H. filed a "De Facto Parent Statement." In it, he indicated he was the "Step Dad trying to get all 3 kids back per CPS since July." As to K.R., he stated he had been her stepfather for over three years, and that she lived with him from August 2008 through September 2010, and from April 2011 through May 2011. D.H also indicated he had responsibility for the day-to-day care of the minor during those dates. He stated, "I met [K.R.] the day she was born I am the only father she has ever know[n]."

---

**²** We also consider on appeal only the record before the juvenile court at the time of the order from which the parties have appealed, namely the record before the court as of March 7, 2013. We therefore deny D.H.'s request for judicial notice (made on September 25, 2013) of orders and proceedings occurring after March 7.

In an attached letter, D.H. stated the children had been living in his studio apartment for two months "prior to [Mother's] eviction and Jennifer Toler (Da[ly] City CPS) did come see and approved of the children staying here before they moved in." He also attached a September 13, 2011, letter from the Agency stating "approval of your home for placement of the above named children is [r]escinded, the denial or rescission of approval of your home is based upon the following: [¶] (a) The[] dwelling in which you currently reside (studio) would not provide sufficient space for the three children, and their respective ages/sex."

The court set D.H.'s request for de facto parent status for hearing on February 8, 2012, the date previously set for the six-month review hearing. At the hearing, the court appointed counsel for D.H. and continued the issue of de facto parent status until March 9. The hearing was apparently continued twice more, until May 3. At the hearing, the court ordered supervised visits between the minor and D.H, and again continued the issue of de facto parent status until June 7.

Two supervised visits occurred in May, which the social worker described as "appropriate." The Agency indicated it was "opposed" to the de facto parent request, but was in agreement with continuing visitation because "the visits have been appropriate." The Agency also observed the minor "does not appear to have a connection with [D.H.] although she was raised by him for the first two [and a] half years of her life."

In preparation for the June 7 hearing, D.H.'s attorney filed a trial brief seeking "presumed father" status. At the hearing, the court granted D.H.'s request for de facto parent status, and continued the issue of presumed father status until July 19.

D.H. had two more supervised visitations with the minor in June, which the social worker again described as "appropriate." The social worker indicated D.H. was "more aware of the child's cues as when the child wants to move on to another activity . . . . The child . . . appears to build rapport with [D.H.] as she continues to have visitation." The social worker also spoke with D.H., who told her he lived with the minor for the first two and a half years of her life, and cared for her while Mother worked. He stated the minor's "well-being was his main concern and that he did not want the mother's children

3

in foster care, as he is willing to care for [them] and provide them with a stable home." In addition, the social worker spoke with mother about D.H., and she indicated she was "in agreement with [D.H.] being declared the presumed father of the child . . . . The mother stated that the child . . . recognizes the name [D.H.] as being her dad." The Agency agreed D.H. should be granted de facto parent status (which had already been granted). It also stated, "it appears that [D.H.] is also a potential presumed father for the child" and recommended the court declare him "to be the alleged presumed father of [K.R.]."

At the July 19 hearing, the court found D.H. to be the minor's presumed father. No party objected. The minor's counsel merely observed D.H. was "aware that this matter has been pending for some time, and he would like an opportunity to participate in services." The court ordered the Agency to prepare a reunification plan for D.H. and continued the matter until August 21.

In its August 20 report, the Agency stated "In regards to [D.H.] the presume[d] father . . . [, the] Agency respectfully recommends that the Matter be set for a continued hearing to address services for [D.H.]. The[re] has not been enough time to address [D.H.'s] protective capacity especially around contact with the mother, to address [D.H.'s] mental health state as he has indicated th[at] he was 5150'd and that he was on psychotropic medications and to address any other services that he may need t[o] assist with facilitating reunification." The Agency recommended termination of services to Mother, supervised visitation with D.H. and continuing the matter of services for D.H. until September 11. In an addendum report filed the following day, the Agency recommended the minor and D.H. "participat[e] in, [and] successfully complete, a program of counseling/psychiatric therapy as directed by the social worker, with specific treatment to be based upon an assessment completed by an approved therapist," and that D.H. participate in a mental health evaluation.

At the August 21 hearing, the court terminated services to Mother and ordered D.H. to participate in counseling/psychiatric therapy as directed by the social worker, a parenting class, dyad therapy, and therapeutic visitation. The court also ordered D.H. to

4

participate in a mental health evaluation, and authorized unsupervised visitation with the minor "when deemed appropriate by the Dept."

Approximately one month later, D.H. had his first unsupervised visit with the minor. After five minutes, D.H. called the foster mother because K.R. was crying and he could not console her. D.H. had three more unsupervised visits with the minor, with the foster mother in attendance. The minor, then four years old, told the social worker she did not want to visit D.H.

D.H. also participated in five "collateral" therapy sessions with the minor's therapist between September 14, 2012 and November 6, 2012. When the social worker informed the therapist the Agency was not recommending placement with D.H., the therapist stated "this might change when Dyad Therapy occurs between the child and [D.H.]."

Psychologist Robin Press conducted a psychological evaluation of D.H. He tested in the high average range of intelligence. In her report, Dr. Press concluded his "character is fundamentally collaborative, altruistic and kind. He is prone to blame himself for problems rather than to find fault with others. His motives for caring for [K.R.] appear genuinely humane. . . . He has achieved a stable sobriety and has also managed to achieve stability in his mood although he still struggles with experiences of apathy, dysphoria, detachment, emotional deadness and a sense of physical malfunction. . . . [D.H.] tests as capable of functioning as a loving, responsible, stable parent to this child at this time. He would be considered a safer parent if he returned to AA meetings at this time and if he agreed to seek treatment at any time in the future if his symptoms of depression worsened."

In the Agency's December 12 status review report, the social worker indicated a dyad therapy session with D.H. and K.R. occurred on November 16, 2012. The therapist reported the minor " 'did not invite [D.H.] into her play until the very end of the session.' " The therapist recommended a bonding study. The social worker told the therapist the court had ordered that dyad therapy occur more than once a week, but the therapist responded "this was [my] clinical decision." The social worker also indicated

5

that despite the court's August 21 order, she had not referred D.H. to a parenting class and had not referred him for therapeutic visitations.

The 18-month review hearing, as well as D.H.'s placement request, was heard over eight days between December 21, 2012, and January 28, 2013. During this time period, the minor's attorney, on January 22, 2013, filed a section 388 "motion" to set aside D.H.'s presumed father status "based upon new information obtained through testimony at trial."

On March 7, 2013, the court denied the section 388 motion, ruling it did "not state new evidence for a change of circumstances that is in the best interest of the child" and the testimony at the review hearing was simply an "increased level of specificity . . . not new information." The court also found the reunification services provided to D.H. "were reasonable in the context of this case." The court further found the Agency had not met its burden of establishing, either by substantial evidence or clear and convincing evidence, that returning the minor to D.H.'s custody would create a substantial risk of detriment to her, and ordered a "transitional return" over a 30-day period.

DISCUSSION

*Presumed Father Status*

The minor and the Agency both contend the juvenile court abused its discretion in denying the minor's section 388 motion to vacate the order finding D.H. to be the minor's presumed father. The Agency, alone, further contends the court should have invoked "its inherent power to set aside the order" under section 385.

"Under the dependency law scheme, only mothers and presumed parents have legal status as 'parents,' entitled to the rights afforded such persons in dependency proceedings, including standing, the appointment of counsel and reunification services. [Citations.] In an appropriate case, a man or a woman who is not a child's biological parent may be deemed his or her 'presumed parent.' " (*In re M.C.* (2011) 195 Cal.App.4th 197, 211.) Family Code section 7611, subdivision (d) provides a man may be a child's presumed father if he "receives the child into his home and openly holds out the child as his natural . . . child." "Presumed fatherhood, for purposes of

6

dependency proceedings, denotes one who "promptly comes forward and demonstrates a full commitment to his paternal responsibilities—emotional, financial, and otherwise[.]" ' [Citation]" (*In re Jerry P*. (2002) 95 Cal.App.4th 793, 801–802.)

An order declaring an individual to be the presumed father, like other orders in a dependency proceeding, may be modified on a showing of change of circumstances or new evidence. Section 388 provides in part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made." (§ 388, subd. (a)(1).) However, the court may modify an order under this section, "only if the court finds by clear and convincing evidence that the proposed change is in the best interests of the child." (*Id.*, subd. (a)(2).)

" '[I]t is not enough for [the petitioner] to show *just* a genuine change of circumstances under the statute. The [petitioner] must show that the undoing of the prior order would be in the best interests of the child. [Citation.]' [Citation.] . . . The change of circumstances or new evidence 'must be of such significant nature that it requires a setting aside or modification of the challenged prior order.' [Citation.]" (*In re Mickel O*. (2011) 197 Cal.App.4th 586, 615.) We review a juvenile court's denial of a section 388 motion for abuse of discretion. (*In re Mickel O*., at p. 616.)

The change of circumstances alleged by the minor here was that the testimony at the extended 18 month hearing showed D.H. "had not received [K.R.] into his home within the meaning of Family Code section 7611, subdivision (d)." She asserted the "testimony revealed that [K.R.] had never lived with [D.H.] because the truth was that [D.H.] lived with Mother and [K.R.]" She further asserted this "new" evidence showed D.H. "was not responsible for [K.R.]'s day-to-day care even when he did live with Mother: he was more like a live-in babysitter than a parent in that he only took care of [K.R.] when Mother was at work or at appointments."

In support of her assertion that D.H. cannot be the presumed father because he "lived with Mother and K.R." in the mother's home, the minor relies on three cases. None is on point.

In *In re D.M.* (2012) 210 Cal.App.4th 541, the mother's boyfriend, who was not the biological father, moved in with her three months before the minor was born. (*Id.* at p. 545.) The boyfriend helped the mother prepare the home for an infant, bought baby supplies, and visited the minor in the hospital. (*Id.* at pp. 546–547.) The infant, however, was taken into protective custody directly from the hospital based on the mother's lack of bonding, termination of parental rights to a sibling, and an ongoing dependency proceeding regarding another sibling. (*Id.* at p. 545.) The juvenile court found the boyfriend to be the presumed father, observing he had " 'received the child into his home as far as he could under the circumstances of this particular case.' " (*Id.* at p. 548.) The Court of Appeal reversed, stating "the juvenile court's observation that [the boyfriend] had done what he could to 'develop' a bond . . . suggest[s]that the court considered only the possibility that [the boyfriend] *would develop* a parental relationship with the child, not that the relationship *already existed*." (*Id.* at p. 555, italics added.) Here, in contrast, D.H. had a parental relationship and lived with the minor for most of the first three years of her life.

In *In re A.A.* (2003) 114 Cal.App.4th 771, two men, the biological father and de facto father, sought presumed father status. The court granted de facto status to R.B. and allowed the minor to be placed with him, but held the biological father was the presumed father. (*Id.* at p. 778.) The Court of Appeal reversed, holding the de facto father had held himself out as the minor's father, and "[a]lthough the minor was not received into [the de facto father's] home to live with him on a full-time basis, he was involved with the minor from the very beginning, with Mother's blessing." (*Id.* at p. 784.) As for the biological father, there was no evidence he held the child out as his own, or that the minor was received into his home. (*Id.* at pp. 785–787.) There was only "secondhand evidence" (hearsay from the biological father's lawyer) that the minor lived with the mother and biological father in "somebody's home for one to three months," insufficient to support

presumed father status. (*Id*. at p. 786 & fn. 9.) Again, the circumstances here are in sharp contrast—D.H. consistently stated he resided with and cared for the minor for most of the first three years of her life.

In *In re Spencer W*. (1996) 48 Cal.App.4th 1647, the court, indeed, observed that the individual denied presumed father status "did not receive the child into *his* home, but instead . . . [the] mother permitted [him] to live in *her* home." (*Id*. at p. 1653.) However, the fact the individual lived in the mother's home, and not vice versa, was *not* the reason why he was denied presumed father status. Rather, it was because of other aspects of his relationship with the mother and child. These included, for example, the fact the mother paid all the expenses and supported the boyfriend using the money she received from the aid to families with dependent children program, and that he stopped residing with her when her income ceased. This revealed the individual "acted out of personal convenience and self-interest," not a commitment to the child. He was also "equivocal in asserting his parental relationship" and "specifically told the social worker he was *not* [the minor's] father." (*Id*. at pp. 1651, 1653.) Thus, the Court of Appeal readily agreed there was no evidence of "either foundational element required for presumed father status" and affirmed the order denying such. (*Id.* at p. 1655.) As we have recounted, the evidence here was distinctly different.

Moreover, in *S.Y. v. S.B*. (2011) 201 Cal.App.4th 1023, the court concluded that where the mother's home serves as the family home, an individual seeking presumed parent status can meet the "receiving into the home" requirement. In *S.Y.*, the mother contended the individual seeking presumed parent status " 'failed to satisfy the receiving requirement because she never brought the children into her own house,' " but instead lived with mother and the children. (*Id.* at p. 1032.) The court rejected this assertion, explaining "there is ample evidence to support the trial court's finding that [mother's] home served as the family home, and that S.Y. received the children into their joint home." (*Ibid.*) " 'This is not a case where [S.Y.] just cared for the kids because it was convenient or because of self-interest. [S.Y.] made personal, professional and financial sacrifices to care for the children.' " (*Id.* at p. 1033.)

Thus, whether D.H. initially moved into the mother's residence is beside the point. The evidence before the juvenile court showed that in December 2009, he and mother got an apartment together and his name was on the lease. The minor and her half brothers lived with them, and D.H. took care of the minor, feeding her, changing diapers, taking her to appointments, buying her toys and taking her on outings.

The minor's counsel acknowledges all this, but contends D.H. was "more like a live-in babysitter than a parent in that he only took care of [K.R.] when Mother was at work or at appointments." However, the record, even those pages to which the minor cites, shows otherwise. In response to the question "can you describe some of the things you did . . . to care for [K.R.] while you were living with her?," D.H. responded "Everything, really. Sun up to sun down. Watch [K.R.] when [Mother] went to her appointments. . . . [¶] [E]verything around the house, waking her up, dressing her, brushing her hair, giving her baths, . . . preparing the meal, feeding, cleaning the house, picking up, you know, shows on TV, laying down with her and reading her books." Then, in March 2011, the minor and her two half brothers moved in with D.H. at his apartment in Redwood City following Mother's "open CPS case." Prior to the children moving in, a social worker visited his home and gave him "the okay" for the children to live with him. D.H. acted as the children's primary caregiver without help from anyone else while they lived with him. He also was their sole financial support. The children stopped living with D.H. in May 2011, after Mother came to get the minor and the social worker told D.H. he "couldn't keep her kids from her."

As the juvenile court found, the purportedly new evidence—the testimony at the hearing—was simply an "increased level of specificity . . . not new information." Furthermore, the additional specificity confirmed the juvenile court's initial determination of presumed father status was solidly grounded—there was ample evidence before the court supporting its finding that D.H. had established both requirements of presumed father status. Accordingly, the juvenile court did not abuse its discretion in ruling the minor failed to meet her burden under section 388 of making a prima facie

10

showing of "new evidence" to support a finding that "the best interests of the child . . . may be promoted by the proposed change of order." (§ 388, subd. (d).)

**Minor's Placement with D.H.**

The minor and the Agency also contend the juvenile court erred in returning the minor to D.H.'s custody, asserting the evidence showed placing her in his custody "would be detrimental to her physical and emotional well-being" under section 366.22.[3]

Section 366.22 sets forth the standards for the 18-month review hearing. It provides in part: "After considering the admissible and relevant evidence, the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child . . . would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child. The social worker shall have the burden of establishing that detriment." (§ 366.22, subd. (a).) We review a juvenile court's findings under section 366.22 for substantial evidence. (*Jennifer A. v. Superior Court* (2004) 117 Cal.App.4th 1322, 1345.)

The minor claims her "bonding [with D.H.] was interrupted," and "[i]t is highly unlikely" she has "any memory of ever having lived" with D.H. Specifically, she contends the interruption took place between September 2009 and December 2009. However, D.H. testified he continued to have contact with K.R. during that time "[t]wo or three times a week, maybe four," and the minor, her siblings and mother "came for Thanksgiving." In December 2009, D.H. moved back in with the family, and the minor admits that after the three-month "interruption," D.H. saw her "nearly every day after

---

[3] Although the juvenile court erroneously referenced section 361.2, the parties do not dispute section 366.22 is the applicable provision. Section 361.2 requires the court to make the detriment finding by clear and convincing evidence, while section 366.22 requires the detriment finding to be made by a preponderance of the evidence. (*In re Z.K.* (2011) 201 Cal.App.4th 51, 70; § 366.22, subd. (a).) The juvenile court, in any case, found the Agency failed to demonstrate detriment by either clear and convincing evidence or by a preponderance of the evidence.

school and on some weekends," and she and her half brothers moved in with him in March 2011.[4]

The minor next contends placing her with D.H. would be "detrimental to her physical and emotional well-being [because D.H.] was not cooperative with [the Agency]: he had angry outbursts directed at social workers, did not maintain consistent communication with [the Agency], could not get along with foster parents, and expected everything to be done around his schedule." Even if these allegations were true, none of them establish a substantial risk of detriment to the minor's physical or emotional well-being. "[I]t bears repeating that the government cannot separate children from their parents based on a psychologist's estimate that a parent is[, among other human characteristics,] . . . 'cynical, passive-aggressive, rigid, [or] easily argumentative. . . .' " (*In re Kimberley F*. (1997) 56 Cal.App.4th 519, 533.) Moreover, the minor bases her accusations on the social worker's opinion in the December 2012 report that D.H. "was very accusatory" and claimed she (the social worker) was a " 'liar,' and [her] intent was never to reunify him with [K.R.]." Given the Agency's continued rebuffment of D.H.'s ongoing attempts to obtain visitation and custody, beginning when the minor and her half siblings were initially detained in July 2011, an angry outburst at the social worker after a year and a half of frustration is hardly surprising.

The minor and the Agency also contend D.H.'s "history presented several protective risks." They assert his alcoholism and depression, which included a suicide attempt in 2009, demonstrate a substantial risk of detriment because he does not go to A.A. meetings, "does not consistently participate in any treatment and does not take any medication," purportedly demonstrating a "blatant denial of his alcohol and mental health problems." However, the court ordered D.H. be evaluated by a psychologist, who found otherwise. The psychologist concluded, D.H. "has overcome considerable adversity in

_____

[4] The minor also cites to an online Web site, WebMD.com, in support of her "interrupted bonding"/"probably has no memory" assertion. However, she has not sought judicial notice of this Web site. Nor is it an appropriate subject of judicial notice. (See Evid. Code, §§ 451, 452.)

12

childhood and adulthood. He has achieved a stable sobriety and has also managed to achieve stability in his mood although he still struggles with experiences of apathy, dysphoria, detachment, emotional deadness and a sense of physical malfunction. . . . [D.H.] tests as capable of functioning as a loving, responsible, stable parent to this child at this time. He would be considered a *safer* parent if he returned to AA meetings at this time and if he agreed to seek treatment at *any time in the future if his symptoms of depression worsened*." (Italics added.) In addition, the court expressly found D.H.'s testimony to be "credible" and that "he was very forthcoming about his background, his struggles in life . . . ." It also observed D.H. "has achieved stable sobriety, hence, no problem presently for alcohol for more than three years based on the evidence that was presented to the Court."

Lastly, the minor and Agency contend D.H.'s ongoing relationship with mother presents a substantial risk of detriment. However, the evidence was D.H. and mother were no longer in a romantic relationship. Again, the court found D.H. very open about his relationship with Mother: "They are friends and because he is a kind man, he tries to help her." Nevertheless, when Mother engages in behavior that endangers the children, "[h]e has called the police. . . . [H]e went to mother's home and asked undesirables to leave when he was concerned about the children."

In short, in challenging the juvenile court's section 366.22 custody determination, the minor and the Agency are simply rearguing their view of the evidence. Our review, however, is confined to whether substantial evidence supported the juvenile court's different take on the case—as we have recited, there was ample evidence before the court to support its custody ruling.

### Reunification Services

For his part, D.H. contends the juvenile court erred in ruling the Agency provided reasonable reunification services.

Section 366.22, subdivision (a), provides that in determining whether to return physical custody of the minor to a parent, "the court shall . . . make appropriate findings pursuant to subdivision (a) of Section 366." (§ 366.2, subd. (a).) Section 366,

subdivision (a), provides in part: "The status of every dependent child shall be reviewed periodically as determined by the court but no less frequently than once every six months . . . . The court shall consider the safety of the child and shall determine all of the following: [¶] . . . [¶] (B) The extent of the agency's compliance with the case plan in making reasonable efforts . . . to return the child to a safe home . . . ." (§ 366, subd. (a)(1)(B).) Section 366.22, subdivision (a), further provides: "The court shall determine whether reasonable services have been offered or provided to the parent or legal guardian." (§ 366.22, subd. (a).)

As a preliminary matter, the minor and the Agency contend the "reasonable services" issue is "not justiciable" and "moot" because the court was not required to make such a determination since it placed the minor with the presumed father, D.H. Section 366.22 does not state that the "reasonable services" determination is to be made only when a child is not returned to his or her parents. Moreover, California Rules of Court, rule 5.708(i) provides: "Regardless of whether or not the child is returned home, the court . . . must determine all of the following: . . . (2) The extent of the agency's compliance with the case plan in making reasonable efforts . . . to return the child to a s safe home . . . ." Accordingly, the juvenile court's determination that reasonable services had been provided was not a superfluous finding. Nor is the issue moot. At any future section 366.26 hearing, the court "shall not terminate parental rights if: [¶] (A) At each hearing at which the court was required to consider reasonable efforts or services, the court has found that reasonable efforts were not made or that reasonable services were not offered or provided." (§ 366.26, subd. (c)(2)(A).) We therefore consider D.H.'s challenge to the court's adequate services finding.

" 'Reunification services implement "the law's strong preference for maintaining the family relationships if at all possible." [Citation.]' [Citation.] . . . [The Department] must make a ' " 'good faith effort' " ' to provide reasonable services responsive to the unique needs of each family. [Citation.] '[T]he plan must be specifically tailored to fit the circumstances of each family [citation], and must be designed to eliminate those conditions which led to the juvenile court's jurisdictional finding. [Citation.]' [Citation.]

14

. . . The adequacy of [the Department's] efforts to provide suitable services is judged according to the circumstances of the particular case.  [Citation.]  '[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . .'  [Citation.]"  (*Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1501.)

"The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances."  (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)  "[W]ith regard to the sufficiency of reunification services, our sole task on review is to determine whether the record discloses substantial evidence which supports the juvenile court's finding that reasonable services were provided or offered."  (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762.)

D.H. maintains the services provided to him were not reasonable because "no visitation was permitted between [K.R.'s] removal on June 15, 2011 and May 4, 2012."  However, " ' " '[o]nly a "statutorily presumed father" is entitled to reunification services under . . . section 361.5, subdivision (a) and custody of his child under . . . section 361.2.' " ' [Citation.]"  (*In re Cody B.* (2007) 153 Cal.App.4th 1004, 1009.)  Neither stepparents nor de facto parents are entitled to "reunification services, custody, or visitation."  (*Clifford S. v. Superior Court* (1995) 38 Cal.App.4th 747, 752.)  D.H. was not found to be the presumed father until July 19, 2012.  Accordingly, he was not entitled to services prior to that time.

D.H. next contends reunification services were inadequate because he had only two dyad sessions with the minor, no "therapeutic" visitation, and no referral to a parenting class.  However, D.H. had been having regular visitation with K.R. since May 2012.  He began having unsupervised visitation in October 2012, and concedes he had six visits that month, three visits in November, and five visits in December.  He also participated in five "collateral" therapy sessions with the minor's therapist between

15

September 14 and November 16.  On November 9, the court ordered "frequent therapeutic, dyad and unsupervised visits . . . , including overnights."  While the therapeutic visits never occurred, D.H. continued to have regular visitation.  He also had two dyad sessions, on November 16 and December 3.  The record also reflects D.H. travelled to New York twice during that time, once in November and once in December, and was gone for a total of approximately two weeks, making scheduling of services more difficult.  He was also in a nursing assistant training program, and could only take parenting classes in the evening.  The social worker, however, was not able to find an evening program.

All told, the juvenile court found the reunification services were reasonable. While the services provided may not have measured up exactly to what the court had ordered, the court was on solid ground in concluding that, overall, reasonable services were provided.

### DISPOSITION

The juvenile court's order of March 7, 2013, is affirmed.


_____
Banke, J.


We concur:


_____
Margulies, Acting P. J.


_____
Dondero, J.


16